1
2
3
4
5
6
7
8
                              UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF WASHINGTON
9
                                    AT SEATTLE

10 | A.A., by and through her parents and | CASE NO. C13-357RSM
guardians, J.A. and W.A.,

11 | | ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTION

                 Plaintiff,

12

13       v.

14 BLUE CROSS AND BLUE SHIELD OF
ILLINOIS, a division of HEALTH CARE
SERVICE CORPORATION ILLINOIS

15 STATE PAC, NFP; THE BOEING
COMPANY MASTER WELFARE

16 PLAN; THE BOEING SERVICE
CENTER FOR HEALTH AND

17 INSURANCE PLANS; and EMPLOYEE
BENEFIT PLANS COMMITTEE,

18

                 Defendant.

19

20        This matter is before the Court for consideration of Plaintiff's Motion for Preliminary

21 Injunction. Dkt. #11. Plaintiff A.A., appearing through counsel, filed this action pursuant to the

22 Employment Retirement Security Act of 1974 ("ERISA"), appealing the termination of A.A.'s

23 in-home skilled nursing care benefits by Defendants. Jurisdiction is proper pursuant to ERISA,

24 29 U.S.C. § 1001, *et seq.*, 29 U.S.C. § 1132(a)(1)(B), (3) and (e)(1). Venue is proper under 29

1  U.S.C. § 1132(e)(2). Plaintiff now seeks a preliminary injunction to enjoin Defendant to continue

2  providing coverage for Plaintiff's in-home skilled nursing care for up to 16 hours per day during

3  the pendency of this action. Defendant has opposed the motion. The Court heard oral argument

4  on May 14, 2013, and the matter has been fully considered. For the reasons set forth below, the

5  motion shall be GRANTED.

6  **DISCUSSION**

7  **I.  Standard of Review**

8  Assuming, without deciding, that the abuse-of-discretion standard applies, the Court's

9  task is to determine whether the plan administrator properly applied the terms of the Plan as

10  written. Under the abuse-of-discretion standard, the Court will uphold the decision of an ERISA

11  plan administrator "if it is based upon a reasonable interpretation of the plan's terms and was

12  made in good faith." *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178

13  (9th Cir. 2005) (quoting *Estate of Shockley v. Alyeska Pipeline Serv. Co.*, 130 F.3d 403, 405 (9th

14  Cir. 1997).

15  **II.  Preliminary Injunction Standard**

16  A plaintiff seeking a preliminary injunction must show that: (1) the plaintiff is likely to

17  succeed on the merits, (2) the plaintiff is likely to suffer irreparable harm in the absence of

18  preliminary relief, (3) the balance of equities tips in the plaintiff's favor, and (4) an injunction is

19  in the public interest. *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). The Ninth

20  Circuit Court of Appeals has also articulated an alternate formulation of the *Winter* test, under

21  which a plaintiff may prevail on a motion for preliminary injunction by establishing "serious

22  questions going to the merits and a balance of hardships that tips sharply towards the plaintiff. . .

23  so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

24

1    injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

2    1135 (9th Cir. 2011)(internal quotes omitted). The panel in *Alliance* concluded that this type of

3    "sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision

4    in *Winter.*" *Id.* at 1134. This Court thus applies a test for a preliminary injunction that is

5    consistent with both *Winter* and *Alliance*: a party must satisfy all four elements of the *Winter* test

6    articulated above; the party may alternatively satisfy the first and third elements of *Winter* by

7    raising serious questions going to the merits of its case and a balance of hardships that tips

8    sharply in its favor. *Id.* at 1137–38.

9        **A.   Likelihood of Success on the Merits**

10        The Court now considers the first *Winter* prong: the likelihood that Plaintiff will succeed

11    on the merits of her claims. A.A. seeks future benefits, enforcement of her rights, and

12    clarification of future benefits rights under ERISA § 502(A)(1)(B), and enforcement of the terms

13    of the benefits plan under ERISA § 502(A)(3). Again, under the abuse-of-discretion standard,

14    Plaintiff must show that she has a likelihood of success in establishing that the ERISA plan

15    administrator's interpretation of the plan's terms was unreasonable or not made in good faith.

16    *Boyd*, 410 F.3d at 1178.

17        At issue are several interpretations of the Plan language made by the plan administrator:

18    (1) that A.A.'s in-home care is not in lieu of inpatient hospitalization or institutionalization and

19    thus not covered by the Plan, (2) that A.A. is not "homebound," (3) that A.A.'s care is

20    "custodial," and (4) that A.A.'s care is "maintenance." Taking into consideration all of these

21    interpretations, the Court finds that the likelihood of success weighs strongly in Plaintiff's favor,

22    as it is likely that these interpretations are unreasonable under the abuse-of-discretion standard.

23              a.   A.A.'s in-home care is in lieu of inpatient hospitalization or
                    institutionalization.

24

The terms of A.A.'s Boeing Plan cover home health care visits—including skilled nursing care—"*only* when inpatient hospital or skilled nursing facility care otherwise would be required." Dkt. #12-1 at 16 (emphasis added). Defendant claims that Plaintiff has only asserted that she is "at *risk* of being hospitalized if she does not receive in-home care," and that the Plan does not provide home health care coverage as a "precautionary measure to avoid possible future hospitalizations." Dkt. #16 at 17 (emphasis added). Defendant argues that A.A.'s future hospitalization is of "no certainty," and thus the provision of home care to prevent such hospitalization is inconsistent with the goal of home care under the Plan, which is to "provide a lower cost alternative to inpatient hospitalization." Dkt. #16 at 17–18.

Contrary to Defendant's assertions, the administrative record indicates a strong likelihood of A.A.'s hospitalization in the absence of in-home skilled care. The record indicates that, prior to A.A.'s in-home skilled nursing care, she was "repeatedly hospitalized and seen in the emergency room for urgent medical intervention due to her respiratory status." Dkt. #15 at 2. A.A. needs "frequent suctioning for oral secretions," Dkt. #15-1 at 2, and A.A.'s in-home care has provided her with "early assessment, nebulized therapies, and vigilant secretion management to enable her to avoid hospitalization and more serious illness." Dkt. #15 at 2. The threat of A.A.'s hospitalization is far from speculative: A.A. is dependent upon "the skill and vigilance of her caregivers in order to prevent recurrent hospitalization." Dkt. #11 at 15.

Defendant also asserts that because A.A. does not *presently* need hospitalization, her home skilled care cannot be considered to be "in lieu" of hospitalization. Dkt. #16 at 9. This interpretation of the Plan language is likely unreasonable. A.A. does not need hospitalization because she is currently receiving in-home care. Dkt. #22 at 7. Defendant's interpretation of the Plan language would render meaningless the Plan's provision for in-home skilled care as an

1   alternative to hospitalization: the moment a patient received sufficient in-home skilled care such

2   that the patient did not face imminent hospitalization, the in-home skilled care would no longer

3   be considered "in lieu" of hospitalization. Judge Lasnik likewise rejected this type of

4   interpretation of the same Plan language in *K.F. v. Regence BlueShield*, No. C08-0890RSL, 2008

5   WL 4330001, at *1, *2 (W.D. Wash. Sept. 19, 2008). In *K.F.*, Judge Lasnik rejected the

6   provider's interpretation, which would "force parents to stand by and watch as their child's

7   health deteriorates to the point where acute medical intervention becomes necessary just so they

8   could prove that her condition is serious enough to require hospitalization. This cannot be right."

9   *Id.*  This is exactly the situation A.A.'s parents would be faced with under Defendant's

10  interpretation of the Plan language. A.A. is very likely to succeed in establishing that such an

11  interpretation is unreasonable under the abuse-of-discretion standard.

12          Defendant argues that even if A.A. were eligible for in-home nursing care, 16 hours of

13  continuous care is not medically necessary. Dkt. #16 at 18. Defendant claims that because A.A.

14  has only "rare instances of unscheduled treatment," "intermittent" care, rather than continuous

15  care, is sufficient. *Id.* at 18–19. However, A.A.'s airway secretions can require suctioning "at any

16  time of the day or night," and this "does not occur on a schedule."  Without the proper caregiver

17  immediately available to provide suctioning, A.A. could experience serious injury or even death.

18  Dkt. #14 at 2–3. It is unreasonable to construe the unpredictability of A.A.'s serious needs as

19  support for a reduction in her care.

20          b.   A.A. is "homebound" within the meaning of the plan.

21          A.A.'s Boeing Plan also requires A.A. to be considered "homebound" in order to be

22  eligible for in-home health care. Dkt. #12-1 at 16. A person is "homebound" as defined in the

23

24

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION - 5

1   Plan when "leaving home involves a considerable, taxing effort and . . . you cannot use public

2   transportation without help." *Id.*

3         Defendant argues that A.A. is not homebound. Dkt. #16 at 18. Defendant points to a letter

4   written by one of A.A.'s treating physicians, Dr. Nancy L. Linscott, which states that "[A.A.] is

5   not homebound due to family transportation in her wheelchair." Dkt. 12-1 at 254. However, there

6   is nothing to indicate that Dr. Linscott was interpreting the term "homebound" as it is defined in

7   the Plan language. Dr. Linscott's statement that A.A.'s ability to be transported out of the home

8   via wheelchair renders her "not homebound" is inconsistent with the plain language of the Plan,

9   which explicitly contemplates "leaving home." *Id.* at 16. Defendant's reliance on Dr. Linscott's

10  personal interpretation of the term "homebound" is misplaced.

11        A.A. is quite clearly "homebound" as it is defined in the Plan: A.A. has cerebral palsy,

12  mental retardation, blindness, and seizures, is unable to handle airway secretions on her own, and

13  requires frequent suctioning of her airway. *Id.* at 256. A.A. is wheelchair-bound, bed-bound, and

14  attends school with the help of an aide. *Id.* A.A. cannot leave home without considerable help

15  from others, and cannot ride public transportation on her own. A.A.'s condition fits directly

16  under the plain language of the Plan's definition of "homebound." A.A. is very likely to succeed

17  on her claim that Defendant's contrary interpretation is unreasonable under the abuse-of-

18  discretion standard.

19                 c.   <u>A.A.'s care is not "custodial care."</u>

20        A.A.'s Boeing Plan states that it does not cover "custodial care." *Id.* at 26. The Plan

21  defines "custodial care" as that which is "designed primarily to assist in the activities of daily

22  living and is not primarily provided for its therapeutic value in treating an illness or injury. *Id.* at

23  43. The Plan expressly excludes from coverage "custodial" care that "does not require continuing

24

1  services by skilled medical or health professionals." *Id.* at 26. The Plan includes a nonexclusive

2  list of examples: "help in walking, getting into and out of bed, toileting, bathing, dressing,

3  feeding, preparing special diets, and supervising medications that ordinarily are self-

4  administered." *Id.*

5       The in-home care A.A. seeks is likely not "custodial." A.A. requires suctioning, skin

6  assessment, gastrostomy and jejunostomy tube feeding, and medication administration, including

7  "rescue" therapy for secretion management and anticonvulsant therapy. Dkt. 15-1 at 2–3. This

8  exceeds any reasonable interpretation of "custodial care." These services are offered primarily

9  for their therapeutic value to A.A., not to merely assist her in typical daily activities such as

10 toileting and bathing. These services also appear to require the help of skilled medical

11 professionals. Suctioning, for example, "cannot be performed by an unskilled caregiver." Dkt.

12 #14 at 2. A.A. is likely to succeed on the merits as to this claim.

13            d.   A.A.'s care is not "maintenance care."

14      A.A.'s Boeing Plan is also clear in its exclusion from coverage of "maintenance care."

15 Dkt. #12-1 at 26. The Plan defines "maintenance care" as "care provided by licensed

16 professionals or other medical staff that is not expected to result in significant improvement in

17 the patient's medical condition once the patient's condition has stabilized and plateaued." *Id.* at

18 44.  Defendant points to statements made by A.A.'s physician, Dr. Walker, who described A.A.

19 as "stable" and "not at risk for a catastrophic event." Dkt. # 17-1 at 11.

20      Dr. Walker's statement alone, however, does not indicate that A.A.'s care is

21 "maintenance." Despite Dr. Walker's characterization of A.A. as "stable," there are significant

22 indications that this is not the case. A.A.'s airway secretions and suctioning needs are

23 unpredictable. When A.A.'s airway secretions build up, she is in danger of oxygen de-saturation,

24

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION - 7

1 aspiration, pneumonia, brain damage, or death. Dkt. #14 at 3. This cannot be a "stable"

2 condition; this much is expressed by Dr. Ong: "[A.A.]'s condition is not stable without skilled

3 nursing care." Dkt. 15 at 2. To argue that a patient is "stable" and thus no longer deserving of the

4 exact care that is necessary to avoid immediate instability in a patient's condition is

5 unreasonable. Care that is necessary to avoid aspiration and death cannot be "maintenance."

6 Such a construction would require mechanical respiratory services and oxygen tubing to be

7 likewise considered "maintenance" once a patient was breathing normally.

8     Even if A.A.'s state *could* reasonably be considered "stable," suctioning significantly

9 improves A.A.'s condition. Care that significantly improves a stable condition is, by definition,

10 not "maintenance care." Dkt. #12-1 at 44. Thus, regardless of whether A.A. could reasonably be

11 considered "stable" within the meaning of the term in the Plan language, an interpretation of her

12 care as "maintenance" is unreasonable.

13        **B. Likelihood of Irreparable Harm in the Absence of Preliminary Relief**

14     In addition to showing a likelihood of success on the merits, Plaintiff must also show the

15 likelihood of irreparable harm in the absence of the preliminary relief sought in order to succeed

16 on a motion for preliminary injunction. *Winter*, 555 U.S. at 20. Defendant argues that the harm to

17 A.A. if she does not receive in-home care throughout the duration of this action is speculative.

18 Dkt. #16 at 22. In addition, Defendant points out that the denial of home care does not preclude

19 A.A. from going to the hospital if she needs to. *Id.* at 23. Finally, Defendant argues that any

20 speculative harm to Plaintiff would be purely monetary; compensation at a later date would be

21 available, and thus the injury to A.A. is not "irreparable." *Id.*

22     Contrary to Defendant's assertions, the potential harm to A.A. is neither purely monetary

23 nor speculative. Without in-home care, A.A. is at a significant risk of hospitalization. In *M.R. v.*

24

1    *Dreyfus*, 697 F.3d 706 (9th Cir. 2011), the Ninth Circuit found plaintiffs who established a

2    "serious risk of institutionalization" due to reduced access to personal care services had

3    demonstrated a "likelihood of irreparable injury." *Id.* at 720. In addition, the absence of in-home

4    care pending trial will necessarily induce A.A.'s parents to provide alternative care. A.A.'s

5    parents would either provide the care themselves—in lieu of the skilled care which is necessary

6    to adequately address A.A.'s needs— or pay the cost of the skilled care at a significant hourly

7    rate. Either of these options present a likelihood of harm to A.A., in the form of economic

8    hardship, or, in the alternative, A.A.'s likely suffering due to unskilled alternative care. Again,

9    contrary to Defendant's position, this type of hardship is unlikely to be reparable by mere

10   retroactive restoration of benefits. *See Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)

11   (finding the restoration of disability benefits to Plaintiffs facing economic hardship, suffering, or

12   death in the absence of these benefits to be an inadequate remedy.)

13       **C.  Balance of Equities and the Public Interest**

14          The Court will consider together the last two prongs of the *Winter* test: whether the

15   balance of equities tips in favor of the plaintiff, and whether the public interest is served by this

16   preliminary injunction.

17          Defendant asserts that there is an equitable interest in enforcing the written terms of the

18   Plan, as "[o]ne of the principal goals of ERISA is to enable employers to establish a uniform

19   administrative scheme, which provides a set of standard procedures to guide processing of claims

20   and disbursement of benefits." Dkt. #16 at 23. Further, Defendant identifies a "legitimate public

21   interest" in empowering employers to provide benefits only according to the terms of the plan.

22   Dkt. #16 at 24.

23

24

1    Indeed, there is both an equitable and public interest in the enforcement of benefits plans

2  as written. *See Fort Halifax Packing Co. v. Coynes*, 482 U.S. 1, 9 (1987); *Varity Corp. v. Howe*,

3  516 U.S. 489, 497 (1996). However, as set forth above, a reasonable construction of the Plan

4  supports continuation of A.A.'s in-home care, not the suspension of that care. Given the strong

5  likelihood that A.A. will succeed in establishing that Defendant's interpretation of the Plan

6  language is unreasonable, the interest in upholding Plan language as written is served by

7  enforcing the language as Plaintiff, not Defendant, has applied it. Additional public interests

8  weigh in Plaintiff's favor, as without in-home care, A.A. is at a significant risk of serious health

9  complications and institutionalization. Considering each of these interests, the balance of equities

10  and the public interest both tip sharply in Plaintiff's favor.

11    For all of the foregoing reasons, plaintiff's motion for preliminary injunction (Dkt. 11) is

12  GRANTED. The Court waives the bond requirement. Defendants shall continue to provide

13  skilled in-home nursing care to A.A. at a rate of 16 hours a day, seven (7) days per week, until

14  further order of this Court.

15

16    Dated this 24th day of May 2013.

17

18

19

20    RICARDO S. MARTINEZ
      UNITED STATES DISTRICT JUDGE

21

22

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24